Connolly, J.
The defendant, Ryan Conway (“Ryan”), has been charged with the first degree murder of Joel Turner (G.L.c. 265, §1), two counts of armed home invasion (G.L.c. 265, §18C), and three counts of armed assault in a dwelling (G.L.c. 265, §18A), arising from events on Januaiy 31,2001. The defendant has moved to suppress the statement he made to detectives of the Boston Police Homicide Unit (“the Boston Police”) on February 21, 2001. The court began a three-day hearing on the defendant’s motion on January 13, 2003. The Commonwealth presented as witnesses Detective *637 Dennis Harris, Officer William Johnson and Officer Christopher Bailey. The defendant presented as witnesses Sergeant Detective Daniel Keeler, Dr. Malcolm Rogers, Edward Conway (Ryan’s father) and Detective Kevin McGoldrick. For the reasons stated below, the defendant’s motion is DENIED.

FINDINGS OF FACT

Based on the evidence presented at the suppression hearing, this court makes the following factual findings.[1]
On January 6, 2001, Ryan, William Conway (“William”), David O’Donnell and John George, some masked and armed, forcibly entered the second-floor apartment at 781 Columbia Road, Dorchester and took a sum of money, personal property and a quantity of controlled substances. Inside the apartment at the time were Laura Livingston, Adam Kennedy, Michael Lynch, Shawn McGinnis, and Gary Cole. On January 31, 2001, Ryan returned to the second-floor apartment at 781 Columbia Road, Dorchester, this time with David O’Donnell and Michael Buckley. The three men, some armed and masked, forcibly entered the apartment, while John George, as the getaway driver, waited outside in a parked van. Michael Lynch, Scott Kennedy, Brian Saravelas, Christopher Heilig, and Joel Turner were in the apartment at the time. During the entry, David O’Donnell fatally stabbed Joel Turner twice in the chest with a “Rambo style knife.”
On February 15, 2001, Sergeant Detective Daniel Keeler interrogated William at homicide headquarters. Sergeant Keeler advised William of his Miranda rights and William signed the Miranda card. William provided two recorded statements implicating David O’Donnell, Michael Buckley and John George in the January 31st murder of Joel Turner. He denied that Ryan was involved in the January 31st murder. He did admit, however, that he and Ryan participated in the January 6th incident. On February 15, 2001, Ryan was arrested and arraigned on one count of armed robbery while masked (G.L.c. 265, §17), two counts of armed home invasion (G.L.c. 265, §18C), and three counts of armed assault in a dwelling (G.L.c. 265, §18A), arising from the January 6th incident. Ryan was appointed counsel at the arraignment and was released on bail.
At approximately 6:30 a.m. on February 21, 2001, homicide detectives went to Ryan and William’s home located at 42 Cedar Grove Street, Dorchester. The detectives asked Ryan and William to come with them to headquarters for questioning. At headquarters, the detectives interviewed William and Ryan separately. Sergeant Keeler administered a Miranda warning to William, William signed the Miranda card, and waived his Miranda rights. William gave a statement indicating Ryan’s involvement in the January 31, 2001 murder of Joel Turner at 781 Columbia Road, Dorchester.
At approximately 7:40 a.m. Detective Dennis Harris and Detective Kevin McGoldrick properly administered a Miranda warning to Ryan and Ryan signed the Miranda card. Ryan did not ask to speak to an attorney. During questioning the detectives told Ryan that they did not want to discuss the January 6th incident for which Ryan had already been arraigned and assigned counsel. Ryan waived his right to remain silent by repeatedly denying his involvement in the January 31, 2001 murder. The detectives observed that Ryan did not appear to be under the influence of drugs or alcohol. At the time of questioning Ryan was not under the influence of drugs or alcohol. The detectives did not make any promises of leniency to Ryan and did not engage in intimidating or coercive tactics. Ryan was not handcuffed during questioning. In light of the totality of the circumstances, Ryan made a knowing and intelligent waiver of his Miranda rights.
After William’s statement, the detectives told William that Ryan was still denying his involvement in the murder. The detectives asked William if he wanted to speak to Ryan and told William it was important to tell the truth. William was brought to the room where the detectives had been questioning Ryan. William and Ryan had a conversation that lasted approximately five minutes. William told Ryan that this would kill their mother and to tell the truth. None of the detectives were present in the room during the conversation between William and Ryan, the detectives did not record the conversation and they do not know what William and Ryan talked about.
After William left the room, Detective Harris went back in to question Ryan. Ryan gave an untaped statement to the detective admitting his involvement in the murder. At approximately 8:20 a.m. Ryan gave a taped statement admitting his involvement in the murder. In light of the totality of the circumstances, Ryan’s confession was voluntary. Ryan was arrested and charged with the first degree murder of Joel Turner (G.L.c. 265, §1), two counts of armed home invasion (G.L.c. 265, §18C), and three counts of armed assault in a dwelling (G.L.c. 265, §18A), arising from the events on January 31, 2001.
RULINGS OF LAW I. RIGHT TO COUNSEL
The defendant seeks to suppress his statement on the basis that the Boston Police obtained his statement in violation of his right to counsel under the Sixth Amendment of the United States Constitution and Article 12 of the Massachusetts Declaration of Rights (“Article 12”). On February 15, 2001, the Boston Police arrested the defendant on charges of armed robbery while masked, armed home invasion and armed assault in a dwelling for the incident that occurred on January 6, 2001. The defendant was arraigned, appointed counsel, and released on bail. When the defendant gave his statement on February 21, 2001, the defendant did not have this attorney present nor did he ask for said lawyer or any other lawyer to be present to represent him at the time. The defendant asserts *638 that the Boston Police violated his right to counsel by questioning him about a matter inextricably intertwined, see Commonwealth v. Rainwater, 425 Mass. 540, 547 (1997), to the January 6th offense for which he had already invoked his right to counsel. For the reasons set forth below, the court finds that the Boston Police did not violate the defendant’s right to counsel under the Sixth Amendment or Article 12.
A. Sixth Amendment
The Sixth Amendment guarantees the right to the assistance of counsel in all criminal prosecutions. This right attaches once a person has been formally charged, such as at an arraignment. See Rainwater, 425 Mass. at 544. Once a suspect invokes the Sixth Amendment right to counsel, the police cannot question the suspect in the absence of counsel or without counsel’s consent. See id. This right is “offense specific.” Id. “It cannot be invoked once for all future prosecutions . . .” McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). In Rainwater, the Supreme Judicial Court recognized an exception to the offense specific rule, “when the pending charge is so inextricably intertwined with the charge under investigation that [it] cannot constitutionally be isolated from . . . the uncharged offense.” Rainwater, 425 Mass. at 547, quoting United States v. Hines, 963 F.2d 255, 257 (9th Cir. 1992). The United States Supreme Court, however, has subsequently overturned only this aspect of Rainwater that created an exception for inextricably intertwined charges. See Texas v. Cobb, 532 U.S. 162, 168 (2001).[2]
In Texas v. Cobb, the defendant, Raymond Levi Cobb (“Cobb”), confessed to a burglary, but did not confess to the murder of a woman and child who disappeared from the same home Cobb had burglarized that day. Id. at 164-65. After the confession Cobb was indicted and appointed counsel. Id. at 165. Over a year later, while free on bond, he confessed to his father that he murdered the woman and her child. Id. Cobb’s father called the police, who came and arrested Cobb. Id. After law enforcement officials properly Mirandized Cobb, he confessed to the murders in the absence of his counsel for the burglary charge. Id. The Texas Court of Criminal Appeals held that law enforcement officials violated Cobb’s Sixth Amendment right to counsel because his right to counsel attached not only to the offense to which he was charged, but also to other offenses “closely factually related” to the charged offense. Id. at 164. The United States Supreme Court reversed the decision of the Texas Court of Criminal Appeals, declining to read such an exception into the offense specific rule. Id. at 168. The Supreme Court noted that several states, including Massachusetts in its Rainwater decision, had read an exception into the offense specific rule for “factually related” crimes. Id. at 168 n.1. The Supreme Court held that there is no such exception and that its decision in McNeil, “meant what it said . . . that the Sixth Amendment right is ‘offense specific.’ ” Id. at 164.
The Supreme Court recognized, however, that sometimes two charges may involve the same offense. Id. at 172-73. The Supreme Court held that the Sixth Amendment right to counsel, while being offense specific, “does encompass offenses that, even if not formally charged, would be considered the same offense under the Blockburger test.” Id. at 173. Under the Blockburger test “where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.” Id. at 173, quoting Blockburger v. United States, 284 U.S. 299, 304 (1932). Applying this test to the facts of the present case, this court finds that the Boston Police did not obtain the defendant’s statement in violation of his Sixth Amendment right to counsel. The January 6, 2001 incident and the January 31, 2001 incident were not the same act or transaction. See Blockburger v. United States, 284 U.S. at 303 (finding that the first drug sale had come to an end and the next drug sale was not the result of the original impulse).
B. Article 12
In Rainwater, the Supreme Judicial Court addressed the question of whether Article 12 provided greater protection than the Sixth Amendment. The Supreme Judicial Court found “no sufficient reason to depart from the balance the Supreme Court has struck between the interests of defendants and interests of the public . . .” Rainwater, 425 Mass. at 554. The Supreme Judicial Court, however, has not had an opportunity to address the United States Supreme Court’s decision in Cobb. It is unclear whether the Supreme Judicial Court would adopt the Cobb test or continue to apply the inextricably intertwined test for alleged violations of Article 12.[3] This court finds that even if the Supreme Judicial Court chose to continue to use the inextricably intertwined test for alleged violations of Article 12, the Boston Police did not violate the defendant’s right to counsel under Article 12.
Under the inextricably intertwined test the court must look at “whether the same acts and factual predicates underlie both the pending and the new charges.” Id. at 556. The defendant cannot pass this test because the January 31st incident took place 25 days after the first incident and some of the perpetrators and victims were different. Furthermore, this exception to the offense specific rule is extremely narrow and should be applied in an extremely limited manner. See id. at 547-48 n.5. Since this court finds no greater of a connection between the January 6th and January 31st offenses than the connection between the incidents involved in Rainwater (vehicle theft charge and earlier vehicle thefts in the same area with the same call sign and modus operandi), the court *639 cannot say the two offenses are inextricably intertwined.
This ruling is consistent with the purpose of the inextricably intertwined test. The purpose of the test is to prevent the potential infringement on the defendant’s right to counsel on the charged offense. Id. at 557. The closer the connection between the two charges, “the greater the risk that questioning about the uncharged crime will interfere with the right to counsel for the charged offense.” Id. at 558. In Rainwater law enforcement questioned the defendant about the uncharged thefts on the same day that he had been appointed counsel on another auto theft and during questioning actually asked about the charged offense. Id. at 541-42. Despite these facts, the Supreme Judicial Court found that its application of the inextricably intertwined test was consistent with its purpose. Id. at 557-58. In the case before this court, there was less of a risk to the defendant’s Article 12 right to counsel than in Rainwater. The questioning occurred on different days and the detectives specifically told the defendant that they did not want to discuss the January 6th incident. Since there was no intent on the detectives to subvert the defendant’s right to counsel on the January 6th charges and no risk to the defendant’s right to counsel, the court finds that the Boston Police did not violate the defendant’s Article 12 right to counsel.
For the reasons stated above, the court denies the defendant’s motion to suppress based on an alleged violation of the Sixth Amendment and Article 12.
II. MIRANDA
The defendant claims that the Boston Police violated his Fifth Amendment right against self-incrimination because the defendant did not make a knowing and voluntary waiver of his Miranda rights and did not make a voluntary confession. Specifically the defendant claims that his waiver and confession were not voluntary because he was addicted to Oxycontin, was suffering from a subdural hematoma, has low intelligence, the questioning occurred in the early morning hours, and the Boston Police used the defendant’s brother to coerce the defendant into a confession. In analyzing the defendant’s claim, the court must determine (1) whether the defendant made a voluntary, knowing, and intelligent waiver of his Miranda rights; and (2) whether the defendant made the statements voluntarily without being intimidated or coerced. See Commonwealth v. LeBlanc, 433 Mass. 549, 553-54 (2001). For the reasons set forth below, the court finds that the defendant made a voluntary and knowing waiver of his Miranda rights and his statement was voluntary.
A. Waiver
The Commonwealth has the burden of proving beyond a reasonable doubt that the defendant made a knowing and voluntary waiver of his Miranda rights. See id. at 554. To determine whether a waiver is knowing and voluntary, the court must look at the totality of the circumstances surrounding the waiver. See Commonwealth v. Magee, 423 Mass. 381, 386 (1996). Upon a review of the evidence presented at the hearing on the motion to suppress, the court finds that the Commonwealth has met its burden.
The Boston Police gave a proper Miranda warning, the defendant signed the Miranda card, and there was no evidence that he did not understand the warnings. In fact, this was not the defendant’s first brush with the law. There was testimony during the suppression hearing that the defendant had up to six previous experiences with the justice system. Additionally, there is no evidence that the detectives subjected the defendant to an unusually long interrogation. The detectives picked up the defendant at approximately 6:30 a.m., began questioning him at approximately 7:40 a.m. and the defendant gave his statement at approximately 8:20 a.m. The evidence also indicates that the defendant was not handcuffed during questioning.
The defendant claims that his addiction to Oxycontin and his suffering from a subdural hematoma rendered his statements involuntaiy. At the suppression hearing, Dr. Malcolm Rogers (“Dr. Rogers”), a forensic psychiatrist, testified for the defendant. Dr. Rogers, however, did not believe that the defendant’s addiction and head injury had an effect on the defendant’s actions. Dr. Rogers testified that he conducted a mental exam of the defendant and found that the defendant was of clear mind and understood the confidentiality rules. He also described the defendant’s subdural hematoma as minor with no long-term effect. Taking these facts, in conjunction with the detectives’ testimony that the defendant did not appear to be under the influence of drugs or alcohol, the court finds that the defendant’s addiction and injury did not render his waiver involuntaiy.
The defendant also claims that his waiver was involuntary because the detectives used the defendant’s brother to coerce his confession. This fact, even if true, does not relate to the defendant’s waiver of his Miranda rights. The defendant’s brother did not come into the room to speak with the defendant until after the defendant had already waived his right to remain silent and to an attorney. After the detectives Mirandized the defendant and he signed the Miranda card, the defendant waived his right to silence by repeatedly denying his involvement in the murder. The defendant also did not request to have his attorney present. The court further finds that there is no evidence indicating that the detectives themselves engaged in coercive and intimidating tactics or that the detectives made promises of leniency directly to the defendant. For all of the reasons stated above, the court finds that, given the totality of the circumstances, the Commonwealth has proven beyond a *640 reasonable doubt that the defendant gave a knowing and voluntary waiver of his Miranda rights.
B. The Confession
“A statement is voluntary if it is the product of a ‘rational intellect’ and a ‘free will,’ and not induced by physical or psychological coercion.” LeBlanc, 433 Mass. at 554. The defendant claims that the detectives coerced the defendant by directing the defendant’s brother to tell the defendant that it would help the defendant’s case if he cooperated. The record contains insufficient evidence to support such a contention. The detectives specifically denied making any such statements and there was no direct evidence from the defendant or the defendant’s brother to suggest that these statements were made. Furthermore, at the time of the statement the defendant appeared free from the influence of drugs, alcohol, or a physical or mental impairment, and the defendant had not undergone an unusually lengthy interrogation.
Dr. Rogers testified that, in his opinion, the defendant’s statement was not voluntary because the defendant’s brother had told him (1) to tell the truth and (2) that this would kill their mother. First, the Supreme Judicial Court has consistently held that suggesting broadly to a defendant that he tell the truth does not violate the defendant’s Fifth Amendment rights. See Commonwealth v. Burgess, 434 Mass. 307, 314 (2001); Commonwealth v. Meehan, 377 Mass. 552, 564 (1979).[4] Second, a motive to protect a parent’s feelings is not sufficient to render a statement involuntary. See Commonwealth v. Raymond, 424 Mass. 382, 396 (1997) (holding that officers raising the possibility of charging the defendant’s mother as an accessory was not sufficient to find the defendant’s confession involuntary). When looking at the totality of the circumstances, the court finds that the Commonwealth has proven beyond a reasonable doubt that the defendant gave a voluntary confession.

ORDER

For all of the above reasons, the defendant’s motion to suppress statements is DENIED.

The court has taken some of these facts from the defendant’s statement on February 21, 2001 and from statements given by the defendant’s brother on February 15, 2001 and February 21, 2001 to the members of the Boston Police, all of which were testified to and/or entered into evidence at the suppression hearing. The court notes that any facts relating the events on January 6th and January 31st are taken as tme only for the purposes of this motion.

This court is bound by the United States Supreme Court’s interpretation of the Sixth Amendment. See North Carolina v. Butler, 441 U.S. 369, 376 (1979) (“[A] state court can neither add to nor subtract from the mandates of the United States Constitution”); Commonwealth v. Bryant, 390 Mass. 729, 741 (1984); Commonwealth v. Montanez, 388 Mass. 603, 604 (1983).

This court acknowledges that it is equally plausible that the Supreme Judicial Court might find that the inextricably intertwined test announced in Rainwater is essentially the same test announced in Cobb.

In Meehan, the Court held that an officer’s statements to the defendant, that a confession would “probably help your defense; in fact, I am sure it would," and “that the truth is going to be a good defense in this particular case,” crossed the line for permissible suggestions to a defendant during questioning. Meehan, 377 Mass. at 564-65. In this case, the detective’s statements to William to tell the truth do not approach the impermissible level that occurred in Meehan.